UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRI COOMBS,

                    Plaintiff,                          CIVIL ACTION NO. 12-12496

          v.                                            DISTRICT JUDGE MARK A. GOLDSMITH

                                                        MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

### REPORT AND RECOMMENDATION
### ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 7, 11)

Plaintiff Terri Coombs challenges the Commissioner of Social Security's ("Defendant")

final denial of her benefits application.  Cross motions for summary judgment are pending (Dkt.

Nos. 7, 11).  Judge Mark A. Goldsmith referred the motions to this Magistrate Judge for a Report

and Recommendation (Dkt. No. 2).

## I.      RECOMMENDATION

Because the Administrative Law Judge ("ALJ") failed to provide a thorough analysis of

listing 1.04B and failed to properly apply the treating-source rule, this Magistrate Judge

**RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's

motion for summary judgment be **DENIED**, and the case be **REMANDED**.

## II.     DISCUSSION

### A.      *Framework for Disability Determinations*

Under the Social Security Act, (the "Act") Disability Insurance Benefits and

Supplemental Security Income are available only for those who have a "disability."  *See Colvin*

*v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as

the inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment, which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months. 42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the
> severe impairment meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be disabled regardless of
> age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits
> are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work,
> if other work exists in the national economy that plaintiff can perform, in view of
> his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534

(6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the

analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers

to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.    *Standard of Review*

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited such that the Court

"must affirm the Commissioner's conclusions absent a determination that the Commissioner has

failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of

evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## III.   REPORT

### A.   *Administrative Proceedings*

Plaintiff applied for supplemental security income as well as disability and disability insurance benefits on December 27, 2006, alleging she became disabled on October 12, 2006 (Tr. 17). After the Commissioner initially denied Plaintiff's application, she appeared with counsel for a video hearing before ALJ Ayrie Moore, who considered the case *de novo*. In a written decision, the ALJ found Plaintiff was not disabled (Tr. 17-26). Plaintiff requested an Appeals Council review (Tr. 12). On April 10, 2012, the ALJ's decision became the final decision of the Commissioner when the Appeals Council declined further review (Tr. 1-3).

### B.   *ALJ Findings*

Plaintiff was 42 years old on her disability onset date (Tr. 25). She has a tenth-grade education and past relevant work as a laundry laborer, housekeeper, cashier and fast-food worker (Tr. 35, 78). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that she had not engaged in substantial gainful activity since her disability onset date in October of 2006 (Tr. 19).

At step two, the ALJ found that Plaintiff had the following "severe" impairment: back disorder (Tr. 19).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 21).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional

Capacity ("RFC") to:

> lift consistent with the light level of exertion insofar as she can lift and carry up to 20 pounds and up to 10 pounds frequently.  However, [Plaintiff] can stand for only [two] hours during an [eight] hour workday and sit for [six] hours during an [eight] hour workday which essentially reduces her to sedentary work.  She can have the option to stand for a few minutes after sitting for 30 minutes. [Plaintiff] cannot climb ladders or ropes, but can occasionally balance, stoop, kneel, crouch, crawl, or climb ramps and stairs. [Plaintiff] cannot work around hazards such as heights or moving machinery.

(Tr. 21).

At step four, the ALJ found that Plaintiff could not perform her past relevant work as a

laundry laborer, housekeeper, cashier and fast-food worker (Tr. 25, 78).

At step five, the ALJ found Plaintiff was not disabled, because she could perform a

significant number of jobs available in the national economy, including inspector, final

assembler and order clerk for food and beverages (Tr. 25).

### C.     Administrative Record

### 1.     Plaintiff's Hearing Testimony and Statements

In 1992, Plaintiff was involved in a car accident.  Her head went through the windshield;

the back seat jammed into her back; she lost her teeth; and was bedridden for six months (Tr.

37).  Despite her pain, Plaintiff continued to work after the accident: her last job was in October

of 2006 as a laundry worker in a nursing home (Tr. 35-36).  However, it was a very difficult job

that Plaintiff could not continue to perform due to back pain (Tr. 36, 44)

Plaintiff also testified to having seizures, anxiety, depression and panic attacks two to

three times a week.  She described trouble concentrating and sleeping; her legs shake and her

knees occasionally "give out" (Tr. 45, 48, 57-58, 60).  Plaintiff said she takes arthritis medication

for her knees, Vicodin, Xanax, Oxycontin and thyroid medication; she sleeps in a lift chair (Tr.

-5-

44, 52, 54, 57).  Even with medication, her pain is an 8/10 on a daily basis, and she has to take her medication 40 minutes before she can get up in the morning (Tr. 44, 66-67).

According to Plaintiff, she can only: (1) stand for five minutes; (2) sit straight for 10 minutes; (3) sit leaning back for approximately 30 minutes; (4) lift a loaf of bread; and (5) walk less than half a block.  She cannot drive or do any yard work, grocery shopping or housework (except fold clothes) (Tr. 35, 61).  Despite these impairments, she can:  (1) hold a telephone; (2) button her clothes; (3) write; and (4) take care of her personal needs  (Tr. 54-57, 60).

### 2.    Medical Evidence

Plaintiff's impairments preceded the accident.  In 1987, she complained of pain in her lumbar spine (Tr. 264).  The attending doctor found a vague mild tenderness along Plaintiff's mid-lumbar spine, but her straight-leg raising test was negative;[1] the alignment and curvature of the vertebral bodies of Plaintiff's lumbosacral spine were satisfactory; there was no disc-space narrowing; the vertebral bodies, pedicules and bony process were intact; and the sacroiliac joints appeared normal (Tr. 264, 267).

On April 24, 1992, Plaintiff was in a car accident (Tr. 311).  However, her straight-leg raising tests were negative bilaterally, her deep tendon reflexes were symmetrical and physiologic, there was no evidence of spine fracture, and Plaintiff had no trouble moving her extremities (Tr. 311).  In addition, the vertebral bodies of Plaintiff's cervical spine were intact and in normal alignment, there was no abnormality in Plaintiff's posterior elements, Plaintiff's intervertebral disc spaces were maintained and there was no soft tissue abnormality (Tr. 315).

---

[1]A straight-leg raise test helps determine if an individual has nerve root irritation.  A negative test means the individual did not experience pain when the leg was elevated between 30 and 60 degrees, and it helps rule out nerve root irritation as the cause of pain.  *See* http://meded.ucsd.edu/clinicalmed/joints6.htm (last visited April 11, 2013).

On September 12, 2002, Dr. Anthony T. Sheridan – one of Plaintiff's treating physicians – performed an MRI of Plaintiff's lumbar spine.  The alignment was normal and the conus was in its normal position.  However, Plaintiff had decreased disc space, height and signal intensity at the L3-4, L4-5 and L5-S1 levels due to degenerative changes (Tr. 355, 532, 616).  The MRI also revealed the following:

(1)     no focal disc herniation at the L5-S1 level;

(2)     adequate foramina at the L5-S1 level;

(3)     no disc herniation at the L4-5 level;

(4)     normal facet joints at the L4-5 level;

(5)     a mild bulge of the L4-5 disc on the right side and to the foramen which barely touched the right L4 nerve root[2] and hyperintensity zone in that segment of the disc suggesting annular tears, mildly deforming the right L4 nerve root; and

(6)     a small left lateral disc herniation at the L3-4 level which mildly deformed the left L3 nerve root but had normal paravertebral soft tissues.

(Tr. 355, 532, 616).[3]  Dr. Sheridan examined Plaintiff approximately one month later and found the height, interspacing and alignment of Plaintiff's thoracic vertebral bodies were within normal limits.  But, there was mild sclerosis[4] involving the superior aspect of the right sacroiliac joint and several small calcific densities in the pelvis bilaterally indicating possible pheboliths[5] (Tr.

---

[2]"A nerve root refers to the base of a nerve as it branches off the spinal cord to carry motor, sensory and other signals throughout the body."  *See* http://www.laserspineinstitute.com/back_problems/nerve_root/ (last visited April 12, 2013).

[3]Dr. Ruth Ann Buck agrees with the MRI results; nerve root compression and numbness are consistent with a positive MRI at the L3-L4 and L5-S1 levels (Tr. 888, 910).

[4]Sclerosis is "an induration or hardening, such as hardening of a part from inflammation, increased formation of connective tissue, or disease of the interstitial substance."  *Dorland's Illustrated Medical Dictionary*, 1705 (31st Ed. 2007).

[5]"Pheboliths are masses, deposits or growths which develop in the wall of a vein and are composed of calcium or lime."  *See* http://www.ehow.com/about_5100696_pelvic-

-7-

352-353, 530-531, 614-615).  During the course of Plaintiff's treatment with Dr. Sheridan, he

made the following diagnoses:

(1)     August 26, 2002, December 2, 2002, January 28, 2003, May 19, 2003, September 11,
        2003, December 2, 2005, January 5, 2004 and June 11, 2004 - *herniated lumbar disc* (Tr.
        467, 479, 481, 487, 549, 559, 563, 567, 633, 637, 641, 677, 689, 691, 697, 705);

(2)     September 25, 2002 - *thoracic radiculpathy*[6] (Tr. 565, 639);

(3)     March 17, 2003 - *low back pain* (Tr. 555, 711);

(4)     June 19, 2003, August 18, 2003, March 9, 2004, July 19, 2005, December 5, 2005,
        January 30, 2006, February 2, 2006, February 28, 2006 and March 27, 2006 -
        *degenerative disc disease*[7] (Tr. 426, 428, 430, 432, 438, 450, 473, 489, 547, 683, 699,
        703, 719, 721, 723, 725, 731, 743);

(5)     July 17, 2003 and February 11, 2004 - *chronic back pain* (Tr. 475, 491, 685, 701);

(6)     October 8, 2003 and November 4, 2003 - *herniated disc* (Tr. 483, 485, 693, 695);

(7)     April 16, 2004 - *chronic back pain and degenerative disc disease* (Tr. 471, 681);

(8)     October 22, 2004 - *lumbar radiculpathy*[8] (Tr. 463, 673);

(9)     June 16, 2005 - *hernative lumbar disc x 2* (Tr. 455, 747); and

(10)    October 11, 2005 - *L3-L4 herniated disc* (Tr. 442, 735).

        Dr. Sheridan referred Plaintiff to Dr. Michael D. Papenfuse for a consultation.  On

January 13, 2005, Dr. Papenfuse indicated that Plaintiff did not have spinous process tenderness,

---

phlebolith_.html (last visited April 12, 2013).

        [6]Thoracic radiculpathy is a compressed nerve in the middle portion of the spine that
causes pain, numbness, tingling or weakness along the course of the nerve.  *See*
http://www.medicinenet.com/radiculopathy/article.htm (last visited April 12, 2013).

        [7]"Degenerative disc disease is a spinal condition caused by the breakdown of your
intervertebral discs."  *See* http://www.mayfieldclinic.com/PE-DDD.htm (last visited April 12,
2013).

        [8]Lumbar radiculpathy is a compressed nerve in the lower back that causes pain,
numbness, tingling or weakness along the course of the nerve.  *See*
http://www.medicinenet.com/radiculopathy/article.htm (last visited April 12, 2013).

scoliosis, kephosis[9] or costovertebral angle tenderness.  Plaintiff also had: (1) a full range of motion of both the cervical and lumbar spine with no pain upon extension, flexion and right and left lateral rotation; (2) a negative Patrick's sign;[10] and (3) negative straight-leg raising tests (sitting and supine).  Plaintiff did, however, have bilateral facet tenderness and slightly tender sacroiliac joints (Tr. 543, 627).  Dr. Papenfuse diagnosed Plaintiff with chronic low back pain and bilateral leg pain secondary to degenerative disc disease at multiple levels with L3-L4 and L4-L5 herniated nucleus pulposus (Tr. 544, 628).

Plaintiff fell down her basement stairs on July 15, 2006.  On July 28, 2006, Dr. Mirza Hussain – Plaintiff's second treating physician – excused Plaintiff from work (Tr. 415-416).  On August 8, 2006, Plaintiff reported to Dr. Hussain that her lower-back pain was improved; she requested permission to return to work without restrictions (Tr. 415).

On August 3, 2006, Dr. Joseph E. Talbot reported that Plaintiff had a normal lordotic lumbar curvature and vertebral alignment; Plaintiff's vertebral body heights and disc spaces were maintained; there were no fractures, focal osseous lesions or compromise of the posterior elements; and the surrounding soft tissues were normal (Tr. 520-521, 604-605).

On October 16, 2006, Dr. Hussain indicated that an EMG revealed Plaintiff had bilateral L4 to S1 nerve root irritation (Tr. 413).[11]

---

[9]Kephosis is the extreme curvature of the spine that is also known as a hunchback.  *See* http://medical-dictionary.thefreedictionary.com/Kephosis (last visited April 12, 2013).

[10]Patrick's sign "reproduces leg pain with lateral rotation of the flexed knee[.]" See http://www.aafp.org/afp/1998.0415/p1825.html (last visited April 12, 2013).

[11]Dr. Buck agrees with the EMG results (Tr. 910).

Dr. Ruth Ann Buck – Plaintiff's third treating physician[12] – examined Plaintiff's lumbar spine on February 6, 2007 and found normal lordotic curvature, lordotic cervical spine curvature, thoracic spinal curvature and vertebral alignment; Plaintiff's vertebral body height and disc spaces were maintained; there were no fractures, focal osseous lesions or compromise of the posterior elements; and the surrounding soft tissues were normal (Tr. 220-222, 372-373, 375).

On March 13, 2007, Dr. Donald J. Cady noted that Plaintiff had three worn discs in her back; an uneven spine; and she walked with a stiff-legged, wide-based gait.  Plaintiff could only bend one-third of the way down; she could not squat, walk on her heels and toes or tandem walk; and her tendon reflexes were absent[13] (Tr. 228, 230, 234).  However, Plaintiff had a good range of motion and straight-leg raising was possible to 45 degrees bilaterally in the supine position (lying down) and 90 degrees bilaterally in a seated position (Tr. 230, 234).  Dr. Cady concluded that Plaintiff could sit, stand, stoop, carry, push, pull (although she complained of a clicking under her left arm), button her clothes, tie her shoes (although she complained of numbness in her right hand), dress and undress, use a telephone, open a door, make a fist with her left hand, pick up a coin and a pencil, write, get on and off the examining table and climb stairs (Tr. 231).

Dr. Shane Kleinrichert completed a Physical Residual Functional Capacity Assessment on March 29, 2007.  He found Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand and walk at least two hours in an eight-hour workday; sit approximately six hours in an eight-hour workday with the ability to sit and stand at will; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; and never climb ladders, ropes or scaffolds (Tr.

---

[12]Dr. Buck began treating Plaintiff on December 6, 2006 (Tr. 878)

[13]"When reflex responses are absent[,] this could be a clue that the spinal cord, nerve root, peripheral nerve, or muscle has been damaged."  *See* http://www.spineuniverse.com/exams-tests/neurological-exams-sensory-nerves-deep-tendon-reflexes (last visited April 12, 2013).

250-251).  According to Dr. Kleinrichert, the "[c]urrent RFC assessment may well be more restrictive than [Plaintiff's] actual limitations.  However[,] [Plaintiff] is still capable of other work at her current age based on restrictions assessed on this RFC" (Tr. 256).

On April 15, 2007, Dr. Robert C. Satonik diagnosed Plaintiff with acute exacerbation of chronic back pain (Tr. 364).  One year later, Dr. Buck prescribed Plaintiff a lift chair.  She found Plaintiff had left sciatica lumbar facet arthritis; and a sharp, stabbing pain in her back that prevented Plaintiff from lying flat (Tr. 864, 902).

During a follow-up examination with Dr. Buck on October 29, 2008 for uncontrolled back pain, Dr. Buck indicated that Plaintiff cannot sleep flat; must sleep in a lift chair; had a positive straight-leg raising test;[14] constant pain in her tail bone; sacroiliac joint pain; a sharp, stabbing pain that shoots up her spine to her neck; restless legs; mild atrophy[15] in her right calf and left thigh; bilateral foot drop;[16] and dull, aching lumbar pain (Tr. 400, 866).  Dr. Buck found that Plaintiff could not carry more than 15 pounds and that "[at] [t]his time [she] do[es] not feel [Plaintiff] will be able to go back to a physical or sedentary job with her current impairments despite optimization of therapy" (Tr. 401-402, 865, 867).

Dr. Buck was deposed on November 4, 2008.  She testified that Plaintiff:

---

[14]Dr. Buck does not specify whether Plaintiff's positive straight-leg raising test was sitting or supine.  This Magistrate Judge assumes it was sitting, because Dr. Buck indicated that Plaintiff cannot lie supine.

[15]Muscle atrophy is the loss of muscle tissue.  *See* http://www.nlm.nih.gov/medlineplus/ency/article/003188.htm (last visited April 15, 2013).

[16]"Foot drop . . . refers to a weakening of the muscles that allow one to flex the ankle and toes, causing the individual to drag the front of the foot while walking and to compensate for this scuffle by bending the knee to lift the foot higher than usual." *See* http://www.spine-health.com/conditions/leg-pain/what-foot-drop (last visited April 15, 2013).

(1)     has left-sided sciatica; scoliosis; osteoarthritis; osteopenia of her lumbar spine; spinal arachnoiditis;[17] motor atrophy; restless legs; positive straight-leg raising tests (seated);[18] bilateral foot drop; degenerative disc in L3 to S1; facet arthritis in L3 to S1; pain in her lumbar spine and numbness in her lower extremities that is consistent with nerve root compression; and limitation of motion in her spine;

(2)     is expected to develop vertebral fracture due to severe bone loss in L3;

(3)     cannot bend; keep her hands over her head for extended periods of time; and sit or stand for extended periods of time;

(4)     has trouble walking down stairs;

(5)     trips over her feet;

(6)     cannot put her hands behind her back to pull up zippers; and

(7)     cannot lie flat unless she takes a significant amount of medication.

---

[17]

Arachnoiditis is a debilitating condition characterized by severe stinging and burning pain and neurologic problems.  It is caused by an inflammation of the arachnoid lining–one of the [three] linings that surround the brain and spinal cord.  This inflammation causes constant irritation, scarring, and binding of nerve roots and blood vessels.

The predominant symptom of arachnoiditis is chronic and persistent pain in the lower back, lower limbs or, in severe cases, throughout the entire body.  Other symptoms may include: [t]ingling, numbness, or weakness in the legs . . . [s]evere shooting pain [and] [m]uscle cramps[.]

*See* http://www.spineuniverse.com/conditions/spinal-disorders/arachnoiditis (last visited April 15, 2013); *see also* 20 C.F.R. § 1.00K(2)(b) ("[a]lthough the cause of spinal arachnoiditis is not always clear, it may be associated with chronic compression or irritation of nerve roots . . . or the spinal cord. [I]ndividuals with arachnoiditis, particularly when it involves the lumbosacral spine, are generally unable to sustain any given position or posture for more than a short period of time due to pain").

[18]Dr. Buck testified that she could not perform the straight-leg raising test in the supine position, because it was difficult for Plaintiff to lie flat (Tr. 922).

(Tr. 882-883, 886, 888, 904, 918-924, 930, 932, 938-940).  Dr. Buck ordered Plaintiff a shower

seat and prescribed her a handicap sticker and a porta-potty (Tr. 904, 926, 930).  She wrote that

Plaintiff is:

> totally disabled from any gainful employment secondary to her bilateral lower
> extremity radiculopathy, secondary to the disc herniations, degenerative disc
> disease, the nerve root compression, her paresthesias, her bilateral foot drop,
> which makes [Plaintiff] fall.  Most people will not . . . hire someone that is going
> to fall on their face.  Inability to walk for any extended period, excessively
> restless legs which is part of the whole condition.
>
> So if you put her in a job function she has to be able to get up and be able to move
> around every 15 to 20 minutes.  Most places don't offer that opportunity to sit and
> stand alternately every 15 minutes.
>
> Plus we have the concern that if she's in like a food place, service place she can't
> work because it's greasy and she's already slipping on regular surfaces, so that
> takes food service completely out of the question.  So she's a hazard to herself.
> She also, which we didn't elaborate on as much, but even way back in February 1,
> '07[,] I showed that she had upper extremity radicular pain . . . on the right side.
> She happens to be a right-hand dominant individual with decreased strength on
> the right arm over the left minus five over five on the right, plus five over five on
> the left.  And that makes it difficult to put her hands over her head so therefore
> [Plaintiff] should not be lifting anything above their[sic] head, should not push,
> should not pull anything really other than herself.  So that takes a lot of jobs out.
>
> And she would have difficulty in typing.  If we go into more of a secretarial based
> position she wouldn't be able to do that once, again, for movement in her hands
> and stuff.  So I don't know how [Plaintiff] is going to work in a job.

(Tr. 934-938).  Dr. Buck also found that Plaintiff's impairments satisfy listing 1.04 "[w]ithout a

doubt" (Tr. 938).

### 3.    Vocational Expert

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual of

Plaintiff's age, education and past work experience who is able to perform work at the light

exertional level, but could only stand for two hours, sit for six hours and must alternate between

sitting and standing.  The individual would need to stand every 30 minutes and could

occasionally perform postural activities, but never climb ladders or ropes.  Finally, the individual

could not work around hazards, heights or moving machinery.  The VE testified that the standing

restriction would prevent such an individual from performing Plaintiff's past work (Tr. 79).

However, the individual could perform work as an inspector, final assembler and order clerk for

food and beverages (Tr. 79-80).  The VE further testified that the individual would be precluded

from all employment, if she had to miss work more than two days a month (Tr. 80).

### D.    Plaintiff's Claims of Error

#### 1.    Listing 1.04

Plaintiff first argues that her impairments meet or medically equal listing 1.04:

***Disorders of the spine*** (e.g., herniated nucleus pulposus, spinal arachnoiditis,
spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral
fracture), resulting in compromise of a nerve root (including the cauda equina) or
the spinal cord.  With:

A.    Evidence of nerve root compression characterized by neuro-anatomic
distribution of pain, limitation of motion of the spine, motor loss (atrophy
with associated muscle weakness or muscle weakness) accompanied by
sensory or reflex loss and, if there is involvement of the lower back,
positive straight-leg raising test (sitting and supine);[19]

OR

B.    Spinal arachnoiditis, confirmed by an operative note or pathology report
of tissue biopsy, or by appropriate medically acceptable imaging,
manifested by severe burning or painful dysesthesia, resulting in the need
for changes in position or posture more than once every [two] hours;

[OR]

---

[19]Plaintiff's back pain involved the lower back.  She complained of pain in her lumbar
spine, which refers to the lower back.  *See* http://www.spine-health.com/conditions/spine-
anatomy/lumbar-spine-anatomy-and-pain (last visited April 17, 2013).  In addition, Plaintiff had
decreased disc space, height and signal intensity in her lumbar spine; dull, aching lumbar pain;
and she was diagnosed with herniated lumbar disc, low back pain, lumbar radiculpathy,
hernative lumbar disc x 2, chronic low back pain, left sciatica lumbar facet arthritis, and
osteopenia of her lumbar spine.

> C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

If Plaintiff's impairments meet or medical equal the listing, she is disabled and entitled to benefits:

> Under a theory of presumptive disability, [Plaintiff] is eligible for benefits if [she] has an impairment that meets or medically equals an impairment found in the Listing. The Listing describes impairments that are severe enough to prevent [Plaintiff] from doing any gainful activity. 20 C.F.R. § 404.1425(a). If [Plaintiff] cannot show that [she] meets a listed impairment, [she] may be able to establish that [her] impairment "is at least equal in severity and duration to the criteria of any listed impairment." *Id.* [at] § 404.1526(a). When considering presumptive disability at Step Three, an ALJ must analyze [Plaintiff's] impairments in relation to the Listed impairments and must give a reasoned explanation of [her] findings and conclusions in order to facilitate meaningful review.

*Christephore v. Comm'r of Soc. Sec.*, No. 11-13547, 2012 WL 2274328 at *6 (E.D. Mich. June 18, 2012) (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)). The ALJ reviewed listing 1.04 and concluded Plaintiff's impairments did not meet or medically equal that listing:

> [w]hile [Plaintiff's] impairments require comparison to 1.04 of the Listing of Impairments, the impairments do not meet the criteria those Listings require. No medical opinion of record indicates a finding of medical equivalence. Evidence does not show [Plaintiff's] back impairments cause compromise of the nerve root resulting in an inability to ambulate effectively, spinal arachnoiditis, or nerve root compression with muscle atrophy as Listing 1.04 requires. To meet the Listing's criteria set forth in 1.00B2b for inability to ambulate effectively, [Plaintiff] must have an inability to ambulate without using a handheld assistive device that limits the functioning of *both* arms.

(Tr. 21) (emphasis in original).[20]  Plaintiff argues that the ALJ erred in finding her impairments do not meet or medically equal listings 1.04A and 1.04B.[21]  *See* Dkt. No. 7 at 20 (CM/ECF) ("there was substantial evidence that the Plaintiff's nerve roots were compromised"; "Dr. Buck . . . found that [Plaintiff] had spinal arachnoiditis"; "[t]he MRI showed extensive evidence to support radicular nerve root irritations based on bulging and herniated discs"; "a positive EMG . . . showed denervation"; and "Dr. Buck opined that Plaintiff met the requirements of Listing 1.04 . . . do[sic] to bilateral radiculapathy with nerve root compressions, parasthesias, bilateral foot drop, atrophy and the like").

The ALJ did not err in her analysis of listing 1.04A.  Assuming Plaintiff satisfies the other requirements of that listing, there is no evidence that Plaintiff had a positive straight-leg raising test (supine).

The ALJ did, however, err in her analysis of listing 1.04B.  While Plaintiff neither had surgery nor a biopsy, and imaging results did not demonstrate spinal arachnoiditis, Dr. Buck found Plaintiff had spinal arachnoidits, and Plaintiff has the symptoms of this condition: chronic pain in her lower back, leg weakness, shooting pain, compression and irritation of nerve roots, and the inability to remain in one position for an extended period of time.  The ALJ did not thoroughly explain why Plaintiff's impairments did not medically *equal* listing 1.04B.

---

[20]Dr. Buck's opinion that Plaintiff's impairments satisfy listing 1.04 is not entitled to any special significance.  *See* 20 C.F.R § 404.1527(d)(2) and 20 C.F.R. § 404.1527(d)(3) ("[a]lthough we consider opinions from medical sources on [the issue of] whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments . . . the final responsibility for deciding [this] issue[] is reserved to the Commissioner").

[21]Plaintiff does not dispute the ALJ's finding that her impairments do not meet or medically equal listing 1.04C, because she does not have an inability to ambulate effectively.

This case should be remanded for the ALJ to determine whether Plaintiff's back disorder is equal in severity and duration to listing 1.04B.

### 2.        Treating-Source Rule

Plaintiff next argues that the ALJ erred by not affording her treating physicians' opinions controlling weight.

The Sixth Circuit recently explained the weight an ALJ must afford medical sources:

> Treating-source opinions must be given "controlling weight" if two conditions are met:  (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).

> The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion.  *Id.* § 404.1527(c)(2).  These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996).  This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart v. Comm'r of Soc. Sec.*, 2013 WL 896255 at *9 (6th Cir. March 12, 2013).  Neither Dr. Hussain nor Dr. Sheridan rendered an opinion.  Accordingly, this Magistrate Judge focuses on Dr. Buck's opinions.

The ALJ did not err by failing to afford controlling weight to Dr. Buck's opinion that Plaintiff is totally disabled.  *See* 20 C.F.R § 404.1527(d)(1) and 20 C.F.R. § 404.1527(d)(3) (an opinion that a claimant is disabled is not a medical opinion, but an opinion on an issue reserved to the Commissioner that is not entitled to special significance).

But, Dr. Buck also found that Plaintiff has trouble walking down stairs, must alternate between sitting and standing every 15 minutes, and cannot: (1) lift anything above her head or lift more than 15 pounds; (2) put her hands behind her back; (3) bend, push, pull or lie flat; (4) sit, stand or walk for extended periods of time; and (5) work in the fast-food or secretarial industries.  The ALJ did not address this opinion:

> [a]s for the opinion evidence, *I considered the opinion of [Plaintiff's] treating source, Dr. Buck that [Plaintiff] is not capable of working at any job.*  I reject this opinion because it is inconsistent with repeated medical findings of normal strength and reflexes uniformly reported by [Plaintiff's] treating and examining sources.  Dr. Buck's records reflect only mild atrophy in [Plaintiff's] right calf and left thigh, findings that are not otherwise reflected in the record. [Plaintiff's] allegations and reporting to Dr. Buck seem disproportionate to repeated objective evidence of normal findings.  *His[sic] opinion that she can do no work* is also inconsistent with his[sic] assessment that [Plaintiff] can carry up to 15 pounds.  While [Plaintiff] received a tag to park in designated handicapped parking spaces, this does not establish that she is disabled under applicable federal regulations.

(Tr. 24) (emphasis added).  Accordingly, the ALJ did not provide *any* reasons – much less "good reasons" – for not affording Dr. Buck's opinion controlling weight; she did not discuss whether the opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques or whether it was consistent with the other substantial evidence in the case record.  "The failure to provide 'good reasons' for not giving [Dr. Buck's] opinion[] controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation."  *Gayheart*, 2013 WL 896255 at *10 (citing *Wilson*, 378 F.3d at 544).  After failing to make a specific finding as to whether Dr. Buck's opinion was entitled to controlling weight, the ALJ also failed to apply *any* of the factors outlined in 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii) and (c)(3)-(c)(6) to determine the amount of weight to give the opinion.  Specifically, the ALJ failed to consider the length of the treatment relationship with Plaintiff; the number of times Dr. Buck treated Plaintiff; the treatment she provided; the kinds and extent of examinations performed or ordered from specialists and independent laboratories; whether Dr.

-18-

Buck's opinion was supported by medical signs and laboratory findings; and whether Dr. Buck is a specialist.

Notably, the ALJ's failure to comply with the regulations was not a harmless error because the record does not establish that: (1) despite the ALJ's failure to comply with the terms of 20 C.F.R. § 404.1527(c)(2), she otherwise met the regulation's goal; (2) Dr. Buck's opinion was so "patently deficient" that it could not possibly be credited; (3) the ALJ adopted Dr. Buck's opinion; or (4) the ALJ made findings consistent with the opinion. *See Wilson*, 378 F.3d at 547.

This case should be remanded for the ALJ to discuss whether Dr. Buck's opinion regarding Plaintiff's functional limitations is entitled to controlling weight. If not, the ALJ must explain the reasons for the weight assigned to Dr. Buck's opinion using the factors outlined above.

### 3.    Plaintiff's Credibility

Plaintiff's final argument is that the ALJ's credibility determination is flawed because she did not analyze the factors outlined in 20 CFR § 404.1529(c)(3):

(i)    Your daily activities;

(ii)   The location, duration, frequency and intensity of your pain or other symptoms;

(iii)  Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v)    Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi)   Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15-20 minutes every hour, sleeping on a board, etc.); and

(vii)  Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

(emphasis added).[22]  Specifically, Plaintiff argues that the ALJ failed to consider that her pain limits her daily life activities and, in turn, renders her disabled (Dkt. No. 7 at 22 (CM/ECF)). The ALJ acknowledged Plaintiff's testimony that she can only sleep in a lift chair; lift a loaf of bread; sit and stand for short periods of time; requires assistance getting out of cars; and cannot engage in numerous activities of daily living, including driving and shopping (Tr. 22).  However, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of her alleged symptoms were not entirely credible (Tr. 22).  For example, Dr. Buck opined that Plaintiff could lift 15 pounds; the evidence shows Plaintiff's pain medication was working well and the Lidoderm patches provided moderate relief; Plaintiff planned to drive to Texas; and, and one point, Plaintiff reported that she was independent with all activities of daily living (Tr. 23-24).

The ALJ's credibility determination should not be disturbed on appeal.

## IV.   CONCLUSION

Because the ALJ failed to provide a thorough analysis of listing 1.04B and failed to properly apply the treating-source rule, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140

---

[22]Defendant briefly rebuts an argument it believes the Plaintiff made regarding her seizure disorder.  Plaintiff's brief does not contain such an argument; her arguments are outlined in the table of contents section (Dkt. No. 7 at 3 (CM/ECF)).

(1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  April 18, 2013

<u>Certificate of Service</u>

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, April 18, 2013, by electronic and/or ordinary mail.

s/Eddrey Butts
*Acting Case Manager for Magistrate Judge Randon*